FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA   00 FEB 16  PM 2: 05
SOUTHERN DIVISION

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| ESSEX INSURANCE COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 98-PWG-0289-S |
| | ) |
| TRI-SHELTERS, INC., ET AL., | ) |
| | ) |
| Defendants. | ) |

ENTERED

FEB 1 6 2000

## MEMORANDUM OF OPINION

This civil action was filed by Essex Insurance Company pursuant to the provisions of 28 U.S.C. § 2201 and 28 U.S.C. § 1332. The complaint seeks to determine the rights and obligations of the company under a policy of insurance issued to Tri-Shelters, Inc. The policy (No. 3AM-3031) provided for commercial liability coverage from September 20, 1995 through September 1996. The matter is before the undersigned magistrate judge pursuant to the provisions of 28 U.S.C. § 636(c) for consideration of the motion of Essex made pursuant to Rule 56 for summary judgment on the issues of its duty to defend and indemnification related to a law suit filed against Tri-Shelters, Inc. by Ms. Edna Smith Jacobs, as personal representative for the estate of Dennis Paul Smith. (Documents #1 and #36). This court has jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiff is a Delaware corporation with its principal place of business in Virginia. Defendants are Alabama citizens. The amount in controversy exceeds $75,000. Alabama law applies in this action, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). This court is "bound to decide the case the way it would appear that the state's highest court would." *Towne Realty, Inc. v. Safeco Ins. Co.*, 854 F.2d 1264, 1269 n.5 (11th Cir. 1988).

The motion of Essex for a declaration that it is not required to defend or indemnify Tri-Shelters, Inc. is GRANTED on the grounds of Tri-Shelters' failure to provide timely notice of an "occurrence." As this motion proceeds under 28 U.S.C. § 2201, the motion is EXPRESSLY DENIED on all other grounds for the reasons set forth below.

## STANDARD OF REVIEW

Summary judgment is appropriate only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Rule 56, *Federal Rules of Civil Procedure*. In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). Once that initial burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be `no genuine issue as to any

2

> material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [Citation omitted].  Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof.  This rule facilitates the dismissal of factually unsupported claims prior to trial.

898 F.2d at 1532.

Undisputed Facts

On May 15, 1997 Edna Smith Jacobs filed a civil action in the Circuit Court of Jefferson County, Alabama.  (Document #1, Exhibit).  The complaint sought damages from Tri-Shelters, Inc. and Sheree Strong as a result of "negligent and wanton conduct..." which led to the death of Dennis Paul Smith.[1/]

Tri-Shelters, Inc. is an Alabama corporation which operated an assisted living facility located in Jefferson County, Alabama.  In February 1995 Dennis Paul Smith became a resident of Tri-Shelters.  Mr. Smith was afflicted with Alzheimer's disease.  In June, August and again in September of 1995 Mr. Smith wandered away from Tri-Shelters. Tri-Shelter's administrator, Sheree Strong, testified in her deposition that the Birmingham Police Department was notified each time Mr. Smith left the grounds.  Apparently on each of those occasions police officers were able to locate Mr. Smith and assist him in returning to the facility.

On December 26, 1995 Mr. Smith left Tri-Shelters yet again.  Sheree Strong testified in her deposition that Jacquetta Wilkerson had telephoned Strong on the night of December 26 to

---

[1/]     The complaint identified defendant Strong as Sharice Strong.  The defendant's name is Sheree Strong.

report that although she had attempted to stop him Mr. Smith had left the building. Wilkerson told Strong that she had called the police. After speaking with Wilkerson, Ms. Strong also called the police. Ms. Strong recalled that on the night Mr. Smith left Tri-Shelters "it was very cold." On the morning of December 27 Strong met with two Birmingham police officers concerning Mr. Smith. She also notified Edna Jacobs, Mr. Smith's sister, that Mr. Smith was gone. Ms. Jacobs and other family members came to the Tri-Shelters facility. James Owens, president of Tri-Shelters, also learned of Mr. Smith's disappearance on the morning of December 27. He telephoned two local radio stations, the police and state authorities to request assistance in locating Mr. Smith. Owens personally searched the Tri-Shelters' grounds and drove through the neighborhood in an attempt to find Mr. Smith. Ms. Jacobs and members of her family also engaged in the search for her missing brother.

On December 27 James Owens and Sheree Strong met with Ms. Wilkerson to learn the details of Mr. Smith's departure. Ms. Wilkerson told Owens that she had tried to stop Mr. Smith but that he had gone outside, across the parking lot and disappeared.[2] Later the same day, Owens, Strong and Wilkerson met with Ms. Jacobs and her daughter, Tracy Jackson. Ms. Jackson told Mr. Owens that he was responsible for Mr. Smith. Family members also asked Wilkerson about the details of Mr. Smith's departure. Family members specifically asked why they had not been called on the night of December 26.

---

[2]     There is some evidence that in early December the state licensing authorities had expressed concern that Mr. Smith did not belong at Tri-Shelter. (Strong deposition, Exhibit D to defendants' motion for summary judgment, p.126).

4

Members of Mr. Smith's family remained in contact with facility management as the search continued. In January of 1996 Mr. Owens instructed Sheree Strong to contact the state agency which licensed and supervised assisted living facilities to determine how Mr. Smith's disappearance would affect Tri-Shelters.[3/]

Mr. Owens testified in his deposition that he came to believe that the family thought he "had some knowledge of where Mr. Smith was [or] how he disappeared...." The relationship between the family and Mr. Owens, although strained, continued for months. Ms. Jacobs and the authorities continued to search for Mr. Smith for more than one year. On February 3, 1997, more than thirteen (13) months after his disappearance, Mr. Smith's remains were found near a creek in Jefferson County. On May 15, 1997 Edna Jacobs, as personal representative of the estate of Mr.

---

[3/]      Strong testified in her deposition that:

Q:      Who is Mr. Nevins?
A:      Guy Nevins. That's in the, the man down in Montgomery concerning assisted living facilities, so the notes I had, I reviewed them and I wrote it down.
Q:      Why did you call him?
A:      Because he's over the licenses and everything and they wanted to know what would the consequences against Tri-Shelters with Mr. Smith leaving.
Q:      Who wanted to know that?
A:      Mr. Owens.
Q:      O.J.?
A:      Yes.
Q:      Or Al?
A:      O.J.
Q:      What did Nevins tell you?
A:      If I'm not mistaken, he told me to write it up, which I did because I already had notes.
                                        .  .
Q:      What did Mr. Nevins tell you about that, about the consequences to Tri-Shelters?
A:      He really didn't.
A:      Did you ask him?
A:      I did ask him.
Q:      And he said he doesn't know?
A:      He said he really didn't know. He wasn't sure what it would be.
(Strong deposition at pp.134-136) (Emphasis added).

5

Smith, filed a wrongful death lawsuit in which Tri-Shelters, Inc. and Sheree Strong were named as defendants.

The Policy

   Policy #3AM-3031[4] identifies Tri-Shelters as a "home for the aged." The policy also notes that endorsements applicable to the coverage include M/E 029 the "care providers endorsement" as well as M/E 172 "products/completed operations."[5] The general aggregate the commercial liability general liability coverage form includes the following provision.

A.   SECTION I - COVERAGES
    COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY.

    1.  Insuring Agreement.

      a. ... We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result.

      . . .

B.   SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS

      . . .

    2.  Duties In The Event Of Occurrence, Offense, Claim Or Suit.

      a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:
        (1) How, when and where the "occurrence" or offense took place;

---

[4]  The policy is submitted as Exhibit 5 to Smith's brief in opposition to plaintiff's motion for summary judgment.

[5]  The latter provision, M/E 172 "products/completed operations," is not at issue.

(2)   The names and addresses of any injured persons and witnesses; and

(3)   The nature and location of any injury or damage arising out of the "occurrence" or offense.

b.   If a claim is made or "suit" is brought against any insured, you must:

(1)   Immediately record the specifics of the claim or "suit" and the date received; and

(2)   Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c.   You and any other involved insured must:

(1)   Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit."

. . .

C.

SECTION V - DEFINITIONS

. . .

12.   "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

. . .

16.   "Suit" means a civil proceeding in which damages because of "bodily injury," "property damage," or "advertising injury" to which this insurance applies are alleged.

. . .

D.

ENDORSEMENT -029

THIS ENDORSEMENT CHANGES THE POLICY.

CARE PROVIDERS ENDORSEMENT

This insurance does not apply to claims, loss, cost or expense arising:

7

1.    Out of or resulting from either sexual abuse or licentious, immoral or sexual behavior whether or not intended to lead to, or culminating in any sexual act, whether caused by, or at the instigation of, or at the direction of, or omission by, any insured, his employees, patrons or any other person. Abuse shall include, but is not limited to, the negligent or intentional infliction of physical[,] emotional or psychological injury or harm on a person or persons. It is further agreed that claims, accusations or charges of negligent hiring, placement, training or supervision arising from actual or alleged sexual actions or any other type of actual or alleged abuses(s) are not covered;

2.    From the actual or alleged transmission of any communicable disease;

3.    From the rendering of or failure to render any professional services unless such services are endorsed onto this policy;

4.    From physicians, psychiatrists, medical doctors, anesthetists or dentists;

5.    Out of any form of transportation.

## Essex's Motion

Essex argues that it is entitled to an order and judgment declaring that it has no obligation to defend Tri-Shelters in the lawsuit filed by the representative of Mr. Smith nor is it required to indemnify Tri-Shelters for two reasons. First, Essex contends that Tri-Shelters failed to provide timely notice of the "occurrence" and failed to provide timely notice of a claim violating contractual condition precedents to indemnification and defense. Second, Essex contends that there is no contractual obligation to defend or indemnify Tri-Shelters for acts occurring during the rendering of "professional services." Essex also initially argued that it had no duty to defend or

8

indemnify Tri-Shelters due to punitive damages exclusion in the policy. On November 2, 1998 Essex filed a Motion to Withdraw its punitive damages exclusion theory. (Document #39). The motion was granted on November 4, 1998. (Document #40).

In the unusual and unfortunate circumstances of this case the primary response to the motion of Essex comes not from Tri-Shelters but from the personal representative of the estate of Mr. Smith.[6] Ms. Jacobs, as representative, while agreeing that the material facts are not in dispute, challenges Essex's claim to summary judgment. Ms. Jacobs contends that the notice of Tri-Shelters to Essex was timely and disputes that "professional services" were offered by Tri-Shelters.

## APPLICABLE LAW

The clauses of the Essex-Tri-Shelters policy which give rise to the issues in this litigation are standard in the insurance industry. The liability insurance policy most commonly sold in the United States is the commercial general liability insurance policy which provides coverage for a wide variety of risks. The insurance industry has developed formalized procedures for drafting standardized policies of insurance. The Insurance Services Office, Inc., an association of appropriately 1,400 domestic property and casualty insurance companies, is the almost exclusive source for support services and the principal drafter of standard liability insurance policies. *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993). Standardization enables the insurance industry to track claims experience of the defined coverage nationwide which in turn enables the insurers to set realistic premium levels and reserves. This standard assessment

---

[6]     According to Essex, Tri-Shelters was the subject of a "foreclosure." Tri-Shelters no longer operates the facility although the corporation continues to exist. A "representative" of Tri-Shelters, an Owens' family member, knew remarkably little about the past or present operations or officers when he appeared before this court. The contract of insurance was between Essex and Tri-Shelters. Essex has no direct responsibility to the estate.

9

and review is possible only if the words of the policy have the same meaning in New York and Washington as they do in Alabama. *See* Rhonda D. Orin, The Wrong War, 31 Tort & Ins., L.J. 711 (1996). Because insurance policies are standardized, policy holders seeking to purchase insurance are deprived of the normal opportunities to participate in the drafting that they would otherwise enjoy when entering into contractual relationships. In effect, insurance policies are essentially contracts of adhesion. Such a contract is formed when the more powerful of the two bargaining parties writes contract terms that meet its own needs and offers them to the weaker party on a "take it or leave it" basis. Clifford A. Plat, note, The Insurer's Duty to Defend, 13 Pace L.Rev. 144, 146 n.30 (1993).

In part because of the nature of the relationship between the potential insured and the insurer "limitations on coverage are interpreted as narrowly as possible so as to provide the maximum allowable coverage to the insured." *American States Ins. Co. v. Martin*, 662 So.2d 245 (Ala. 1995). As the policy is drafted almost exclusively by the insurer, nearly all jurisdictions construe the disputed terms and provisions against the drafter. It is clear, however, that in Alabama, as in most jurisdictions the parties' conflicting constructions of otherwise unambiguous policy language do not necessarily render the disputed language ambiguous. *Upton v. Mississippi Valley Title Insurance Co.*, 469 So.2d 548 (Ala. 1985); *Watkins v. Fid. & Guar. Co.*, 656 So.2d 337 (Ala. 1994). Courts may not re-write the terms of a policy or interpret unambiguous policy language so as to provide coverage that was not intended by the parties. *Altiere v. Blue Cross & Blue Shield of Alabama*, 551 So.2d 296 (Ala. 1989); *see also Home Indemnity Company v. National Insurance Corp.*, 564 So.2d 945 (Ala. 1990).

10

Notice Requirements

All liability policies contain provisions requiring the policy holder to notify the insurer of certain potentially covered events. Insurance companies typically contend in litigation arising under notice provisions that the clause is important because prompt notice gives the company the opportunity to investigate occurrences and potentially to participate from the outset in the defense of a claim or suit. Notice provisions also afford the company an opportunity to assess the premium level for a particular insured. The two traditional notice requirements include the policy holder's agreement to:

> (1) In the event of an occurrence provide written notice containing particulars sufficient to identify the insured and include reasonably obtainable information with respect to time, place and circumstances of the occurrence as soon as practicable

> and

> (2) If a claim is made or a suit filed the insured shall <u>immediately</u> forward to the insurer any demand, notice, summons, or process received. (Emphasis added).[2/]

---

[2/] For example, the 1992 Insurance Services Office, Inc. (ISO) Commercial General Liability Form Policy provides that:

(2) Duties in the event of occurrence, offense, claim or suit

    (a) You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include

        (1) how and when and where the "occurrence" or offense took place;

        (2) the names and addresses of any injured persons and witnesses; and

        (3) the nature and location of any injury or damages arising out of the "occurrence" or offense.

    (b) If a claim is made or "suit" is brought against any insured, you must:

        (1) immediately record the specifics of the claim or "suit" and the date received; and

        (2) notify us as soon as practicable.

*See* 1 Susan J. Miller and Phillip Lefebvre, *Miller's Standard Insurance Policies Annotated*, 415 (1995).

While policy language is standard there is a marked difference in the manner in which notice clauses are interpreted and enforced. Some jurisdictions, albeit on differing theories, have held that factual issues regarding notice simply are not relevant to an insurer's duty to defend in an ongoing action. These courts generally defer consideration of facts pertinent to notice after the underlying action is resolved. *See, i.e., Vermont Gas, Inc. v. United States Fidelity and Guar. Co.*, 805 F. Supp. 227 (D. Vt. 1992); *UpJohn v. AETNA Casualty and Surv. Co.*, 768 F. Supp. 1186, 1203 (W.D. Mich. 1990); *Hirschberg v. Lumberman's Mut. Casualty Co.*, 798 F. Supp. 600, 602 (N.D. Cal. 1992); *but see also, Maryland Casualty Co. v. W. R. Grace & Co.*, 88 CIV 4337, 1994 U.S. Dist. LEXIS 5505 (S.D. N.Y. 1994). In general, the duty to defend is considered to be independent from and broader than the duty to indemnify. *See Montrose Chem. Co. v. Superior Court*, 861 P.2d 1153, 1157 (Cal. 1993); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1220 (Ill. 1992); *A.Y. McDonald Indus. v. Insurance Company of N. Am.*, 475 N.W.2d 607, 627 (Iowa 1991); *C.D. Spangler Constr. Co. v. Industrial Crank Shaft & Eng'g Co.*, 388 S.E.2d 557, 569 (N.C. 1990).

Under Alabama law, the duty of an insurer to defend its insured from suit is determined from the language of the policy and by the allegations of the complaint filed against the insured. *ALFA Mutual Ins. v. Morrison*, 614 So.2d 381, 382 (Ala. 1993); *Ladner & Company v. Southern Guar. Ins. Co.*, 347 So.2d 100, 102 (Ala. 1977) "If the allegation of the insured party's complaint shows an accident or occurrence which comes within the coverage of the policy, the insurer is obligated to defendant regardless of the ultimate liability of the insured." *Chandler v. Alabama Mun. Ins. Co.*, 585 So.2d 1365, 1367 (Ala. 1991). Under Alabama law, the insured bears the burden of establishing coverage by demonstrating that a claim falls within the policy, see *Colonial Life and Accident Ins. Co. v. Collin*, 280 Ala. 373, 194 So.2d 532, 535 (1967), while the

12

insurer bears the burden of proving the applicability of any policy exclusion. *See U.S. Fidelity & Guar. Co. v. Armstrong*, 479 So.2d 1164, 1168 (Ala. 1985). The duty to defend and the duty to indemnify are contingent upon the insured's performance of all conditions precedent under the terms of the policy itself. Even those courts which defer "coverage issues" until liability is established do so on the theory that exclusions are properly determined through a consideration of the conduct at issue or underlying facts. That is not the case when notice requirements are mandatory precursors to the creation of any duty on the part of the insurer to perform.

Notice Requirements-Condition Precedent

The policy at issue here contains the following requirement.

SECTION IV-COMMERCIAL GENERAL LIABILITY CONDITIONS

. . .

3.    LEGAL ACTION AGAINST US
      No person or organization has a right under this coverage part:
      a.    To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or
      b.    To sue us on this coverage part unless all of its terms have been fully complied with.

. . .

(Exhibit 5 to plaintiff's brief in opposition to Essex's motion for summary judgment.)

Alabama has long recognized "... a distinction between policies in which notice to the insurer [is] ... made a condition precedent to any suit against the company ... and those policies in which there is no express provision making the insurer's failure to give such a notice a ground for forfeiture or a condition precedent...." *American Fire & Casualty Company v. Tankersley*, 270 Ala.

126, 116 So.2d 579, 581 (Ala. 1959).[8] *See also Alabama Farm Bureau Mutual Casualty Insurance Co. v. Mills*, 271 Ala. 192, 123 So.2d 138 (Ala. 1960); *Liberty Mutual Insurance Company v. Bob Roberts and Company, Inc.*, 357 So.2d 968 (Ala. 1978); *Big Three Motors, Inc. v. Employer's Insurance Company of Alabama*, 449 So.2d 1232 (Ala. 1984); *Correll v. Fireman's Fund Insurance Companies*, 529 So.2d 1006, 1007 (Ala. 1988).  Federal courts interpreting Alabama law have consistently recognized that Alabama enforces a notice provision as a condition precedent to an insurer's obligation to perform. *United States Fire Insurance Company v. Watts*, 370 F.2d 405 (5th Cir. 1966), *affirming* Judge Thomas of the Southern District of Alabama in the same case found at 242 F. Supp. 395 (S.D. Ala. 1966); *Phoenix Assurance Company of New York v. Harry Harless Company*, 303 F. Supp. 867 (N.D. Ala. 1969) (Grooms, J.); *Standifer v. AETNA Casualty and Surety Company*, 319 F. Supp. 1385 (N.D. Ala. 1970) (Lynne, J.); *Acceptance Insurance Company v. Schafner*, 651 F. Supp. 776 (N.D. Ala. 1986) ("The insurance contract between *Schafner* and *Acceptance* clearly provides that prompt notification is a condition precedent to any duty of *Acceptance* to provide coverage, or to indemnify or defend *Schafner* in any lawsuit.").

Many of the policies considered above incorporate the term "condition precedent" in the text of the policy language.  A condition precedent is "an act or event, other than a lapse of time, that must exist or occur before a duty to perform certain promised arises." *Black's Law Dictionary* (West 7th Ed.).  If such a condition does not occur and is not excused the promised performance need not be rendered.  The provision of the policy at issue found at § IV, ¶ 3 A and B

---

[8]     In *Tankersley* the policy provision read "Actions Against the Company–No action shall lie against the company unless, as a condition precedent thereto, the insured shall have fully complied with all the terms of this policy...." (*Id*).

14

is a condition precedent as a matter of law. The obligations of the parties are clear from the language of the cited section. *Hall v. American Indemnity Group*, 648 So.2d 556 (Ala. 1994). *See Nationwide Insurance Company v. Nilsen*, 745 So.2d 264, 266 (Ala. 1998) (Finding the duty to submit to an examination under oath following a loss to be a condition precedent to insurer's duty to evaluate a claim). "Whether a contract provision is a condition precedent depends not upon the formal words but upon the interest of the parties to be deduced from the instrument as a whole. *Fidelity & Casualty Co. of New York v. Deloach*, 280 Ala. 497, 195 So.2d 789 (1967), *quoted in Gamble v. Corley, Muncus & Ward*, 723 So.2d 627, 630 (Ala. 1998).

## APPLICATION OF LAW TO FACT–NOTICE

Under Alabama law the burden of proof rests with the insured to establish compliance with the provision respecting the giving of notice of an occurrence as soon as practicable or in the alternative to show a valid reason for not giving such notice as soon as practicable. *Phoenix Assurance of New York v. Harry Harless Company, Inc.*, 303 F. Supp. at 867.[2/] The notice clause at issue imposes two obligations on the insured as conditions precedent to the duty of the company to perform. First, Tri-Shelter was obligated to notify Essex of an "occurrence." Second, Tri-Shelter was contractually bound to notify Essex of "a claim or suit." These obligations, while related, are separate and distinct duties. *See e.g. Olin Corp. v. Insurance Company of North America*, 966 F.2d 718 (2d Cir. 1992)(Denying coverage in DDT pollution cases filed in the United States District

---

[2/]     Essex has argued as more fully set forth below that the four corners of the complaint do not give rise to a duty for it to indemnify or defend Tri-Shelter. For the purposes of the notice analysis, however, it is assumed that the insured demonstrated an occurrence within the ambit of the insurance coverage. Essex has noted the existence of a condition precedent or an exclusion. The burden shifts to Tri-Shelter or Ms. Jacobs to shoulder the burden demonstrating compliance with the notice provisions.

Court for the Northern District of Alabama despite timely notice of suit because the notice of the underlying occurrence was not timely).[10]

     "Notice of occurrence provisions have several purposes. [ ] They enable insurers to make timely investigations of relevant events and exercise early control over a claim. Early control may lead to a settlement before litigation and enable insurers to eliminate the risk of similar occurrences in the future. When insurers have timely notice of relevant occurrences, they can establish more accurate renewal premiums and maintain adequate reserves." *Commercial Union Insurance Company v. International Flavors & Fragrances*, 822 F.2d at 271. Under Alabama law "a requirement in a policy for prompt or immediate notice or that notice must be given 'immediately,' 'at once,' 'as soon as practicable' or 'as soon as possible,' generally means that the notice must be given within a reasonable time under the circumstances of the case." *American Fire and Cas. Co. v. DeKalb-Cherokee Counties Gas District*, 289 Ala. 206, 266 So.2d 763 (1972). In making the determination of reasonableness under the circumstances, the only factors to be taken into consideration are the length of the delay and the reasons therefore. *United States Fidelity and Guaranty Co. v. Bonnitz Insulation Co.*, 424 So.2d 569 (Ala. 1982); *Pinson Truck Equipment Co. v. Gulf American Fire and Casualty Co.*, 388 So.2d 955 (Ala. 1980). Essex correctly observes that "the question of whether the insurer was prejudiced by the delay is immaterial to this determination where ... the giving of reasonably timely notice is expressly made a condition precedent to any action against the insurer." *Correll v. Fireman's Fund Insurance Companies,* 529 So.2d at 1008, *citing*

---

[10]     "Under New York law [like Alabama] compliance with a notice-of-occurrence provision in an insurance policy is a condition precedent to an insurer's liability under the policy." *Commercial Union Insurance Company v. International Flavors & Fragances, Inc.*, 822 F.2d 267 (2d Cir. 1987), *citing Utica Mutual Ins. Co. v. Fireman's Fund Insurance Companies*, 748 F.2d 118, 121 (2d Cir. 1984); *Security Mutual Insurance Company v. Acker-Fitzsimmons Corp.*, 31 N.Y.2d 446, 440, 293 N.E.2d 76, 78, 340 N.Y.S.2d 902, 905 (1972).

*American Fire & Casualty Company v. Tankersly, supra.* The insured's burden is to excuse the absence of notice by establishing the reasonableness of the delay, that is, the length of the delay and the reasons for the delay. *Ladner and Company v. Southern Guaranty Ins. Co.*, 347 So.2d 100 (Ala. 1977).

Although acknowledging prevailing Alabama law, Ms. Jacobs argues that (1) much of the Alabama authority cited by Essex involve cases in which notice was delayed well after suit was filed and (2) that Tri-Shelters' notice of occurrence and suit to Essex was reasonable under the circumstances because neither the "injured person" nor the "injury or damage" arising from the "occurrence" could be determined until after Mr. Smith's remains were found. (Defendant Edna Smith Jacobs' brief in opposition to plaintiff's motion for summary judgment).

Notice of Occurrence

Both the law of Alabama and the express language of the policy imposed upon Tri-Shelters differing notice responsibilities in the case of "an occurrence" and "a claim or suit." The policy requires notice "as soon as practicable" as to the former while the latter calls for "immediate notice." Ms. Jacobs' correctly states that many of the Alabama cases cited by Essex in support of the claim to declaratory relief involve delay in notice of a suit or claim. *See e.g. Liberty Mutual Insurance Company v. Bob Roberts & Company, Inc., supra* (Notice of suit provided sixteen months after service of process) and *Haston v. Trans-American Insurance Serv.*, 662 So.2d 1138 (Ala. 1985). (Notice of suit two years after entry of default judgment). This observation does not however alter the prevailing rule in Alabama that an insured may excuse the delay of timely notice of an occurrence only by demonstrating that the length of the delay was reasonable under the circumstances without reference to a demonstrable prejudice to the insurer. In *Bob Roberts*

17

*Company, Inc., supra,* the Supreme Court of Alabama expressly noted that a failure to comply with either condition precedent will excuse the insurer from performing.[1] There is no question that Alabama law and the Tri-Shelters-Essex policy required notice of an occurrence and of claims as conditions precedent. For example, an insurer's actual knowledge of an occurrence and a potential claim does not relieve an insured of the obligation to deliver suit papers immediately. *See Webb v. Zurich Insurance Compan*y, _____ F.3d ____ , W.L. 18716(11th Cir. 2000), *citing Safeway Insurance Company of Alabama v. Bailey,* ___ So.2d ____ (Ala. Civ. App. 1999). It is also true and of greater relevance to the issues under consideration here that even timely notice of suit does not satisfy the condition precedent of timely notice of an occurrence. *See Olin Corporation of North America, supra.*

Ms. Jacobs also argues that it was reasonable for Tri-Shelters to delay in notifying Essex of the event involved in Mr. Smith's disappearance for more than seventeen months because (1) Tri-Shelters could not have determined the injured party nor the nature and location of any injury or damage as required by the terms of the policy and (2) that notice was provided as soon as the claim by Ms. Jacobs could have been "legally [ ] made." (Jacobs' brief at unnumbered pp.15-17). In *Pan American Fire and Casualty Company v. DeKalb-Cherokee Counties Gas District*, 289 Ala. at 214, 266 So.2d at 771, the Alabama Supreme Court held that "delay [in giving notice] is excusable in the case of an accident [occurrence] ... which furnishes no grounds for the insured acting as a reasonable and prudent man to believe at the time that a claim for damages will arise or that the

---

[1]      "In this appeal, Liberty Mutual contends the trial court erred in granting declaratory relief in favor of Roberts because the evidence shows Roberts failed to comply with the conditions precedent in the policy requiring notice of an occurrence 'as soon as practicable' and when suit is brought, forwarding every demand, notice, summon or other process received 'immediately' we agree with both assertions." *Liberty Mutual Insurance Company v. Bob Roberts and Company, Inc.*, 357 So.2d at 970 (emphasis added).

18

injury is one insured against." The test is not a subjective one measured by the good faith of the insured, but an objective one. The issue "in view of the requirement of objectivity [is] whether ... [Tri-Shelters] as a matter of law, could have expected or anticipated [that the occurrence] would form the basis of a law suit against it." *CIE Service Corporation v. Smith*, 467 So.2d 1244, 1246 (Ala. 1984).

The policy defines the term "occurrence" as an "accident." Under Alabama law, the term "accident" has been variously defined as something unforseen, unexpected or unusual. *Employer's Insurance of Alabama v. Reeves*, 264 Ala. 310, 87 So.2d 653 (1955). It is clear that Mr. Smith's departure from Tri-Shelters on December 26, 1995 was an accident or occurrence. Under Alabama law, whether a delay in reporting an occurrence is reasonable is a question of fact. *Pinson Truck Equipment Company v. American Fire Insurance and Casualty,* 388 So.2d at 957. When the factual issues are considered in light of the operative rules of law, including the rules of construction of the policy language itself, it is apparent that Tri-Shelters' notice of the occurrence was untimely under the terms of the policy.

In *Southern Guaranty Insurance Company v. Thomas*, 334 So.2d 879, 882-3 (Ala.

1976) the Supreme Court of Alabama stated:

> Where facts are disputed or where conflicting inferences may be reasonably drawn from the evidence, the question of reasonableness of the delay in giving notice is a question of fact for the jury. *Provident Life and Accident Insurance Company v. Heidelberg*, 228 Ala. 682, 154 So. 809 (1934). Conflicting inferences concerning the reasonableness of delay may be sometimes drawn where the insured offers evidence of mitigating circumstances. "However, where an insured fails to show a reasonable excuse or the existence of circumstances

19

> which would justify a protracted delay, the Court should as a matter of law hold that there has been a breach of the conditions as to notice ...." *Zurich General Accident and Liability Insurance Co. v. Harbil Restaurant, Inc.*, 7 A.D.2d 433, 184 N.Y.S.2d 51, 53 (1959). *Accord, Provident Life & Accident Insurance Company v. Heidelberg, supra.*

In *Thomas*, the insured delayed six months in giving notice to the insurer and offered no reasonable excuse for the delay, the Alabama Supreme Court held that the delay was unreasonable as a matter of law. *See also Pharr v. Continental Casualty Company*, 429 So.2d 1018, 1019 (Ala. 1983).

The controlling inquiry then is whether delay or indeed the absence of any notice of an "occurrence" from December 26, 1995 to June 18, 1997 was "reasonable under the circumstances." First, it is obvious that on December 26, 1995 Tri-Shelters knew that Mr. Smith left the facility lightly dressed in weather that was described as "very cold." Second, not later than December 27, 1995 Tri-Shelters knew that unlike the earlier occasions when Mr. Smith left the facility he had not been located in a few hours and returned. Third, by December 27, 1995 Tri-Shelters' administrator and president knew that the family of Mr. Smith had expressed disapproval of the decision not to notify them of Mr. Smith's disappearance on the night of December 26, 1995. By December 27, 1995 Tri-Shelters knew that Mr. Smith had not been found despite the assistance of the family, the police, state authorities and radio stations in searching for the Alzheimer's patient. Not later than January 1996, Tri-Shelters' president was sufficiently concerned about the "consequences" to Tri-Shelters that he sought to determine the company's licensing exposure by making inquiry of the state agency charged with the responsibility of supervising assisted care facilities. Mr. Owens, as president of Tri-Shelters, was aware that Ms. Jacobs was becoming increasingly agitated over the disappearance of Mr. Smith and had expressed concern that Tri-

20

Shelters' employees knew something about the disappearance or had something to do with it. Under these circumstances, a reasonable and prudent person would notify an insurance carrier of the "occurrence." Ms. Jacobs contends that Tri-Shelters could not notify Essex of the potential claim until it could be "legally made." This observation conflates the occurrence notice requirements with the claim notice requirements.

In the "occurrence" context, the question is not whether Tri-Shelters knew for certain of a discrete and quantified claim, but whether and prudent officer acting for the entity could have concluded that Mr. Smith's disappearance "furnished no grounds ... to believe that a claim for damages [would arise]...."[12] Under the facts presented here, Tri-Shelters had reason to believe, indeed did believe, that it should be concerned about the consequences from Mr. Smith's disappearance as early as January 1996. For that same reason Jacobs' contention that her lawyers told her that she could not file a lawsuit until Mr. Smith's body was found does not alter Tri-Shelters' contractual duty to notify Essex of an occurrence in a timely fashion.

An insured may not "wait and find out if it is liable..." but, rather, is required to provide timely notice of an occurrence.[13] *Liberty Mutual Insurance Company v. Bob Roberts and Company, Inc.*, 357 So.2d at 970-71. Whether Tri-Shelters did or did not believe that Ms. Jacobs

---

[12] James Owens' testimony that he did not think that the company would be liable civilly or criminally is suspect given the relationship with Mr. Smith's family. The testimony is also, however, irrelevant to the objective assessment the law demands.

[13] While the nature of the possible suit or the relief that may be sought may impact upon the determination of whether an insurer is required to indemnify its insured for a particular conduct, it does not have an effect on whether or not there has been an occurrence as defined by the policy.

would file suit did not relieve the company of the obligation of providing notice of an occurrence. *Acceptance Insurance Company v. Schafner*, 651 F. Supp. at 777.[14]

After consideration of the Alabama law and the undisputed facts it is clear that Tri-Shelters violated a condition precedent to Essex's obligation to perform under the contract in failing to provide notice of Mr. Smith's disappearance "as soon as practicable" under the circumstances. Accordingly, Essex's motion for summary judgment on the grounds of a failure to provide timely notice of an occurrence is due to be and the same is hereby GRANTED.

Condition Precedent--Notice of Claims/Suit

Essex also contends that Tri-Shelters violated a second condition precedent of the policy of insurance in failing to provide timely notice of "a claim or suit." Essex states that on February 3, 1997 human remains later identified as those of Mr. Smith were discovered. Essex does not provide any evidence to suggest that the discovery of human remains put Tri-Shelter on notice that it might be liable for the wrongful death of Mr. Smith. There is no evidence to suggest when Tri-Shelters could have concluded that the remains found were those of Mr. Smith until the wrongful death action was filed by Ms. Jacobs. Suit was filed on May 15, 1997 in the Circuit Court of Jefferson County. Notice of the lawsuit was provided to Essex through Tri-Shelters' local insurance agent on June 18, 1997. Essex concedes that it received the suit papers on June 19, 1997. (See the affidavit of Charles R. Kite, Exhibit I to Essex's motion for summary judgment). Essex also acknowledges that in May of 1997 Debra Owens, the sister of James Owens, succeeded him as

---

[14]   "Schafner contends, of course, that he reasonably believed that Mrs. Frasier would not file suit. In support of this contention he argues that 'there was a substantial question of whether or not Mrs. Frasier pursue [sic] a cause of action.' This court finds, as a matter of law, that such a 'substantial question' cannot support a reasonable belief on the part of Schafner that he would not be sued." *Id.*

president of Tri-Shelters.  Essex contends that "although [Debra] Owens was aware of Smith's disappearance when she became president, she took no action regarding the incident until June 18, 1997...." The "delay" complained of by Essex can only be the period from May 15, 1997 until June 19.  There is no evidence that Tri-Shelters had notice of a claim or service of process prior to May 15.  As a matter of law, the "delay" is not unreasonable.  Essex's Motion for Summary Judgment in its prayer for declaratory relief on grounds of a failure to provide timely notice of a claim or suit is DENIED.

## PROFESSIONAL SERVICES EXCLUSION

While conceding that "... it would appear at first blush that [Jacquetta Wilkerson] could not be performing a 'professional service' when she failed to keep Dennis Smith from leaving Tri-Shelters...." Essex nonetheless argues that because a professional service relates to "[a] vocation or occupation requiring special ... knowledge [ ] and skill" the professional services exclusion set out above at pages 7-8 bars coverage. (See Essex's Motion for Summary Judgment, Document #37, pp.34-35, *citing Allstate Insurance Company v. Sellers-Bok*, 942 F. Supp. 1428, 1433 (M.D. Ala. 1996).  In support of its claim that an attendant employed at an assisted care facility is preforming a "professional service" Essex cites *Alpha Therapeutic Corporation v. St. Paul Fire and Marine Insurance Company*, 890 F.2d 368 (11th Cir. 1989).  In *Alpha Therapeutic* a breach of contract action was filed when a blood center medical technician erred in transcribing test results resulting in a failure to re-test.  The failure to re-test the blood resulted in the distribution of contaminated blood.[15] The district court concluded that the record established that the failure to properly record test results

---

[15]    The medical technicians employed by the blood center not only recorded the results of the tests but performed the tests as well. *See Alpha Theraputic Corporation*, 890 F.2d at 369 n.4.

23

was "an integral part of testing plasma for hepatitis, which is a professional service." *Id.* at 371. The medical technicians were a component of a professional service offered by a technically sophisticated enterprise. There is no evidence or authority for the proposition that providing "assisted living" is a "professional service." There is no authority cited for the proposition that an attendant at such a facility is preforming a professional service. There is no evidence that special knowledge or skill is required of the facility or its employees as the training referred to by Essex is so elementary as to be little more than the functional equivalent of a baby sitting class.

Moreover, the insurance policy does not attempt to define "professional services." Unlike a condition precedent which imposes upon the insured an obligation to demonstrate compliance, the burden of proving the applicability of a policy exclusion rests with the insurer. *See U.S. Fidelity and Guaranty Company v. Armstrong*, 479 So.2d 1164, 1168 (Ala. 1985). If an insurance policy is ambiguous in its terms, the policy must be construed liberally in favor of the insured, and exceptions to coverage must be interpreted as narrowly as possible to provide maximum coverage to the insured. *Altiere v. Blue Cross & Blue Shield*, 555 So.2d at 292. Here neither the policy, the record, or the law of the state of Alabama provide a reasonable basis for concluded that Jacquetta Wilkerson was performing a "professional service" on December 26, 1995. Accordingly, the motion of Essex for declaratory judgment and finding that the professional services exclusion applies to the incidents giving rise to the underlying litigation is DENIED.

A judgment consistent with this Memorandum of Decision will be entered.

As to the foregoing it is SO ORDERED this the $\underline{16}^{th}$ day of February, 2000.

_____

PAUL W. GREENE
UNITED STATES MAGISTRATE JUDGE

25